**IN THE UNITED STATES DISTRICT COURT FOR**
**THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| KRISTEN SMALL, | : | CIVIL ACTION |
| | : | |
| | : | DOCKET NO. 02-CV-3744 |
| v. | : | |
| | : | |
| FIRST RELIANCE STANDARD | : | |
| LIFE INSURANCE COMPANY; | : | |
| E.M. INDUSTRIES, INC., AND | : | |
| E.M. SCIENCE | : | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**Introduction**

Plaintiff filed this lawsuit seeking long term disability benefits from First Reliance Standard Life Insurance Company ("First Reliance Standard").  Benefits were initially awarded to plaintiff, however, benefits were discontinued after her condition significantly improved, as indicated in the reports of her treating physician.

Since plaintiff's lawsuit relates to an employee benefit plan, it is governed by ERISA.  As discussed below, First Reliance Standard's decision to discontinue benefits is consistent with the law of ERISA, the terms in the First Reliance Standard policy and the facts presented.  Accordingly, First Reliance Standard is entitled to summary judgment in its favor.

**Factual Background**

First Reliance Standard provided long term disability coverage to eligible employees of EM Industries, Inc. under group policy No. LSC 063591.  (RSL 111)[1].  The long term disability

---

[1] All "RSL" references are to the administrative record, a true and correct copy of which is being filed with the Clerk.

959830 v.1

policy defines "Total Disability" according to the claimant's class of employment.  The

definition of total disability applicable to plaintiff is defined as follows:

>"Totally Disabled" and "Total Disability" mean, with respect to Class II and III, that as a result of an Injury or Sickness:
>
>(1)    During the Elimination Period and for the first 60 months for which a monthly benefit is payable, an Insured cannot perform the material duties of his/her regular occupation;
>
>(a)    "Partially Disabled" and "Partial Disability" mean that as a result of Injury or Sickness an Insured is capable of performing the material duties of his/her regular occupation on a part-time basis or some of the material duties on a full-time basis. An Insured who is partially disabled will be considered totally disabled, except during the elimination period;
>
>(b)    "Residual Disability" means being partially disabled during the elimination period.  Residual Disability will be considered Total Disability; and
>
>(2)    After a monthly benefit has been paid for 60 months, an Insured cannot perform the material duties of any occupation.  Any occupation is one that the insured's education, training or experience will reasonably allow.  We consider the Insured "Totally Disabled" if due to an Injury or Sickness.  He or she is capable of only performing the material duties on a part-time basis or part of the material duties on a full-time basis.

(RSL 116).

Plaintiff was employed by EM Industries, Inc. as a Technical Web Specialist until

December 1, 1998 when she claims that she became totally disabled.[2]  (RSL 145).  On the claim

form Ms. Small stated that she was disabled due to "hypersomnia and periodic leg disorder

movement."  (RSL 145).  In support of the disability claim, plaintiff provided First Reliance

Standard with a Physician's Statement completed by Wendell A. Grogan, M.D. on June 3, 1999.

(RSL 150-151).  Dr. Grogan diagnosed plaintiff as having periodic limb movements at sleep and

---

[2] Plaintiff completed the disability form on or about June 2, 1999 even though she stopped working approximately six months earlier.  (RSL 146).

hypersomnia.  (RSL 150).  Dr. Grogan further described the symptoms plaintiff was experiencing due to these conditions as "severe sleepiness, non-restorative sleep."  (RS 150).

On the Physician's Statement completed by Dr. Grogan, he stated that in an 8 hour work day, plaintiff was capable of sitting, standing and walking for 1 to 3 hours each.  (RSL 151).  He also stated that plaintiff was capable of driving 1 to 3 hours.  (RSL 151).  Dr. Grogan further indicated on the form that in an 8 hour day, plaintiff was capable of lifting and carrying at a sedentary level.  (RSL 151).  The form asked Dr. Grogan for his opinion on plaintiff's prognosis for recovery.  At that time, plaintiff had not achieved maximum medical improvement, however, he believed that plaintiff would achieve this level of improvement within twelve months.  (RSL 151).  Moreover, Dr. Grogan stated that at the time of maximum medical improvement, plaintiff would be fully recovered.  (RSL 151).

After receiving and reviewing medical records pertaining to Ms. Small, on January 13, 2000, First Reliance Standard notified plaintiff that her claim for benefits was approved through June 3, 1999.  (RSL 74-75).  The letter informed plaintiff that benefits were not payable beyond that date since Dr. Grogan indicated that she was capable of sedentary work.  (RSL 75).  Finally, the letter advised plaintiff of her right to appeal the decision.

On February 11, 2000, plaintiff requested a review of First Reliance Standard's decision to discontinue benefits as of June 3, 1999.  (RSL 68-69).  In support of her appeal, plaintiff provided First Reliance Standard with a February 2, 2000 report from Dr. Grogan.  In the letter report addressed to Ms. Small, Dr. Grogan stated that plaintiff's "night time sleep has become much better."  (RSL 72).  He also stated that she "no longer experience[s] the degree of sleep disruption that was seen before starting medications."  (RSL 72).  However, Dr. Grogan explained that Ms. Small continued to have "severe daytime sleepiness."  (RSL 72).  Based on

the daytime sleepiness, Dr Grogan recommended that plaintiff not work "until we can make more inroads into the familial hypersomnia syndrome." (RSL 72).

During its review of the appeal, First Reliance Standard requested updated medical records from Dr. Grogan and also asked him to complete a Physical Capacities Assessment form describing plaintiff's capabilities. With respect to the medical records, they describe continued improvement in plaintiff's condition. On February 2, 2000, the same date on which Dr. Grogan prepared his letter to plaintiff, he sent a report to Dr. Pileggi. (RSL 45). This letter, however, provided additional details. Dr. Grogan stated that plaintiff's therapy was "successful" in allowing her to "sleep soundly through the night" from 10:00 p.m. to 8:00 a.m. (RSL 45). The doctor remarked, however, that plaintiff continued to experience problems with daytime alertness. (RSL 45). As a result, Dr Grogan started plaintiff on Adderall and asked her to follow-up in a month to review her treatment. (RSL 45).

Dr. Grogan's report from Ms. Small's next visit on March 6, 2000, confirms that the additional medication significantly improved plaintiff's remaining symptoms. (RSL 43). With the addition of Adderall, plaintiff told Dr. Grogan that she was "able to stay awake from about 7:00 a.m. to 8:00 p.m." and "generally feels alert during that time period." (RSL 43). With respect to her other symptoms, Dr. Grogan stated that "Clonopin continues to keep her other symptoms under control." (RSL 43). Dr. Grogan hoped that in the future plaintiff would be able to sustain these normal sleep cycles without medication. (RSL 43). Nevertheless, with the medication it is clear that plaintiff was no longer impaired.

The Physical Capacities Assessment form subsequently completed by Dr. Grogan confirms that plaintiff's improvement was not fleeting. On May 22, 2000, Dr. Grogan completed the form at the request of First Reliance Standard. Approximately one year earlier when he

completed a similar form, Dr. Grogan stated that plaintiff could only stand, sit, walk and drive for one to three hours each in an 8 hour work day. (RSL 27). Dr. Grogan also stated that plaintiff could only exert herself at the sedentary level. (RSL 27). When Dr. Grogan completed the form approximately one year later, on May 22, 2000, he stated that plaintiff was *continuously* capable of sitting, standing, walking and performing various other activities described on the form in an 8 hour work day. (RSL 57). Dr. Grogan also stated that plaintiff was now capable of exerting herself at a light level. (RSL 57).

Dr. Grogan did limit plaintiff in one way on the updated form. According to Dr. Grogan, she should "never" drive. (RSL 57). Dr. Grogan did not explain the basis for this restriction, nor does it make sense since one year earlier, when plaintiff was more impaired, he stated that she could drive between 1 and 3 hours in an 8 hour day. (RSL 27). More important, as discussed below, driving was not a material duty of plaintiff's occupation. Accordingly, she cannot base her disability on an inability to commute to and from work.

Following its review of the medical records, on June 21, 2000, First Reliance Standard responded to plaintiff's appeal. (RSL 32). First Reliance Standard first informed plaintiff that based on the additional information, it was reversing its earlier decision that plaintiff was not entitled to benefits beyond June 3, 1999. (RSL 32). However, based on the reports from Dr. Grogan, First Reliance Standard concluded that plaintiff was no longer totally disabled as of March 6, 2000, the date of Dr. Grogan's report. (RSL 34). The appeal letter referred to the reports of Dr. Grogan which noted that as of March 6, 2000, plaintiff's symptoms were under control. (RSL 33). The letter further stated that plaintiff's own occupation was sedentary and that Dr. Grogan stated she was capable of light duty work. (RSL 33). Accordingly, since the

only restriction Dr. Grogan placed on plaintiff was driving, she was no longer totally disabled as of March 6, 2000. (RSL 33).

Plaintiff responded to First Reliance Standard's decision by filing this lawsuit. For the reasons discussed below, First Reliance Standard is entitled to judgment in its favor based on the facts contained in the administrative record and the law applicable to this claim.

**Legal Argument**

A.      Standard of Review for Motion for Summary Judgment

A motion for summary judgment will be granted where all of the evidence demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Only disputes over facts that might effect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248.

B.      The Standard of Review Under ERISA

Prior to reviewing a plan's decision, the court must first determine the appropriate standard of review. In *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989), the Supreme Court of the United States held that "a denial of benefits. . . is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." When the plan grants to the fiduciary discretionary authority to determine eligibility for benefits, then the court's review of the plan's decision is under the arbitrary and capricious standard. *See*

*Abnathya v. Hoffman & LaRoche, Inc.,* 2 F.3d 40, 41 (3d Cir. 1993); *Mitchell v. Eastman Kodak Co.,* 113 F.3d 433, 437 (3d Cir. 1997).

Under the arbitrary and capricious standard of review, "the court must defer to the administrator of an employee benefit plan unless the administrator's decision is clearly not supported by the evidence in the record or the administrator has failed to comply with the procedures required by the plan." *See Abnathya, supra.* Under this deferential standard, the district court may not substitute its own judgment for that of the plan in determining whether the claimant is eligible for benefits. *See Orvosh v. Program of Group Ins. for Salaried Employees,* 222 F.3d 123, 129 (3d Cir. 2000).

The Third Circuit recognizes that even where a plan grants discretion, a more stringent standard of review should be applied when there is a conflict of interest. *See Pinto v. Reliance Standard Life Ins. Co.,* 214 F.3d 377, 389 (3d Cir. 2000). In *Pinto,* the court established a "sliding scale" which lessens the degree of deference in proportion to the degree that a conflict of interest has been proven. *See Pinto,* 214 F.3d at 379. It is the plaintiff's burden to prove that a conflict of interest exists and the extent of it. *See Schlegel v. Life Ins. Co. of N. America,* 269 F. Supp.2d 612, 617 (E.D. Pa. 2003).

The First Reliance Standard policy states that a monthly benefit will only be paid when a claimant "submits satisfactory proof of Total Disability to us." (RSL 122). "Us" is defined in the policy as First Reliance Standard. (RSL 111). This same language was contained in the policy at issue in *Pinto* where the court held that "[i]t is undisputed that [the insurer] had discretion to interpret the plan." *See Pinto,* 214 F.3d at 379. As explained in *Brown v. Continental Cas. Co.,* 243 F. Supp.2d 321, 325 n. 4 (E.D. Pa. 2003), "in a prior phase of the same [*Pinto*] litigation, an unpublished panel opinion found that 'the provision of the Plan

requiring that a claimant provide 'satisfactory proof' of disability provides the necessary discretion' to an insurer such that a reviewing court should apply the arbitrary and capricious standard." *See Pinto v. Reliance Standard Life Ins. Co.,* No. 97-5297, slip. op. at 7 (3d Cir. May 28, 1998). *See also Russell v. Paul Revere Life Ins. Co.,* 148 F. Supp.2d 392, 400 (Del. 2001); *Yeager v. Reliance Standard Life Ins. Co.,* 88 F.3d 376, 380 (6th Cir. 1996).

Based on the law of this Circuit, the First Reliance Standard policy contains a sufficient grant of discretionary authority.  However, since First Reliance Standard both makes the claim decision and pays any benefits that are owed, the heightened arbitrary and capricious standard applies.  *See Pinto, supra.*  Other than the fact that First Reliance Standard is the insurer of the plan, there is no evidence whatsoever that it acted under a conflict of interest.  As explained below, First Reliance Standard's decision was based entirely on the evidence presented to it and the language in the First Reliance Standard policy.  Accordingly, this court should only diminish the deference owed to First Reliance Standard to a small degree.

C.    The Evidence To Be Considered

When a court reviews a plan's decision under the arbitrary and capricious standard, the court may only look to the record which "consists of that evidence that was before the administrator when he made the decision being reviewed." *See Mitchell,* 113 F.3d at 440.  *See also Kelly v. Connecticut General Life Insurance Company,* 2003 WL 22795648 (E.D. Pa. 2003) (refusing to consider the ruling from the Social Security Administration which was made after the defendant affirmed the denial of benefits and which was not contained in the administrative record).  Based on this law, the court may only consider the evidence in the administrative record when reviewing Reliance Standard's decision.

Separate from the court's review of the claim decision is the court's inquiry into the level of deference that should be given to the fiduciary. *Pinto* does allow a claimant to submit evidence regarding the conflict of interest. *See Pinto,* 214 F.3d at 395. This evidence, however, is clearly distinguishable from evidence that is solely related to the benefit claim. The *Pinto* court identified certain factors that may be considered in the conflict of interest analysis. These include the "sophistication of the parties, the information accessible to the parties, . . . the exact financial agreement between the insurer and the company [and]. . . the current status of the fiduciary." *See Pinto,* 214 F.3d at 392). None of these factors allow the introduction of evidence that is only related to the claim for benefits.

In this case, plaintiff conducted several depositions but counsel fid not limit the questions to the conflict of interest issue. Based on *Pinto,* the only portions of those transcripts that have any relevance and are admissible are those that deal with whether a conflict of interest exists. *See Pinto, supra.*

There is no authority in the Third Circuit which allows plaintiff to submit further evidence in support of her claim after the final decision.   Nevertheless, counsel for plaintiff has continued to send to counsel for defendant additional medical records that are not contained in the administrative record.  To the extent that counsel for plaintiff attempts to introduce this outside evidence to the court in support of the claim as it is expected he will do, there is absolutely no basis for him to do so.  To the extent that any outside materials are submitted by plaintiff, they should be stricken and disregarded by this court.

D.    Application to Plaintiff's Claim

Based on the treatment records contained in the administrative record, plaintiff cannot sustain her burden of proving that she was eligible for benefits beyond March 6, 2003.  To

remain eligible for benefits, plaintiff had to be unable to "perform the material duties of her regular occupation." (RSL 117).  First Reliance Standard does not dispute that plaintiff was disabled for a period of time and it paid benefits to her.  However, the medical records show that plaintiff's condition improved to the point where she was no longer totally disabled as of March 6, 2000.

The improvement in plaintiff's condition can be seen when one compares the statements completed by Dr. Grogan on June 3, 1999 and approximately one year later, on May 22, 2000. (RSL 27; 57).  In June of 1999 plaintiff was only capable of standing, sitting, walking and driving for 1 to 3 hours each in an 8 hour work day. (RSL 27).  She was also limited to sedentary level strength in lifting and carrying. (RSL 27).  Dr. Grogan's records from June of 1999 confirm that plaintiff was still experiencing problems.  Medication that was prescribed to Ms. Small caused her to lose weight and did not prevent her from the need to take naps for a couple of hours during the day.  (RSL 183).  Thus, plaintiff was totally disabled.

Significant improvement in plaintiff's condition began in February of 2000.  At that time a repeat overnight sleep study demonstrated that Ms. Small's night time sleep "has become much better."  (RSL 44).  Plaintiff was no longer experiencing "the degree of sleep disruption that was seen before starting medications."  (RSL 44).  Plaintiff was still suffering from severe daytime sleepiness, however.  (RSL 44).  As a result, she was started on Adderall.  (RSL 45).

By March 6, 2000, the date on which First Reliance Standard determined that plaintiff was no longer totally disabled, she was seen by Dr. Grogan.  Ms. Small told Dr. Grogan that while taking the Adderall, "she is able to stay awake from about 7:00 a.m. to 8:00 p.m." and "generally feels alert during that time period." (RSL 43).  With respect to her other symptoms,

Dr. Grogan stated that these remained "under control" with Clonopin.  (RSL 43).  Dr. Grogan

further stated that Ms. Small was "otherwise doing well."  (RSL 43).

It is clear from an assessment form completed by Dr. Grogan more than two months after

the March 6, 2000 visit that the improvement in plaintiff's condition continued.  (RSL 57-58).

Whereas one year earlier Dr. Grogan stated that plaintiff could only sit, stand and walk for 1 to 3

hours each, in May of 2000 Dr. Grogan stated that plaintiff could perform these activities

*continuously* in an 8 hour work day.  (RSL 57).  Dr. Grogan further stated that plaintiff's

exertional level had increased to light level.  (RSL 57).

Ms. Small's occupation falls within the sedentary level of activity.  Since she was capable

of exerting herself even more and was capable of sitting, standing and walking continuously in

an 8 hour day, was able to stay awake from 7:00 a.m. to 8:00 p.m. and was alert during this time,

there is no reason why plaintiff could not work.  (RSL 43; 57).

It is important to note that this is *not* a situation where First Reliance Standard disagrees

with the opinion of plaintiff's treating doctor.  It is based on her doctor's assessment of her

condition that First Reliance Standard concluded that she was no longer totally disabled.  We

know from Dr. Grogan that plaintiff was awake and alert from 7:00 a.m. to 8:00 p.m.  (RSL 43).

There is absolutely no evidence in the administrative record that plaintiff had any cognitive

problems which prevented her from working.  Therefore, there is absolutely no explanation for

her claim that she remained totally disabled.

It should not be a surprise that plaintiff fully recovered when placed on the correct

medication.  In June of 1999, Dr. Grogan stated that he expected plaintiff to achieve maximum

medical improvement in approximately 12 months.  (RSL 27).  Dr. Grogan also stated that when

her condition changed, he expected that plaintiff would have a "full recovery."  (RSL 27).  Dr.

Grogan's updated claim form which was prepared approximately one year later is consistent with his earlier prognosis. (RSL 57).

Plaintiff may argue that she remained totally disabled since Dr. Grogan restricted her from driving. (RSL 57). The basis for this restriction is unclear since Dr. Grogan stated one year earlier, when plaintiff's condition was significantly worse, that she was capable of driving 1 to 3 hours per day. (RSL 27). While Dr. Grogan's restriction on driving is without basis, even if there was a legitimate reason for it, it could not be the basis for continued receipt of disability benefits.

Numerous courts have held that a claimant's inability to commute to work does not make him/her eligible for disability benefits. *See McMahon v. Digital Equipment Corp., Inc.,* 162 F.3d 28, 40 (1st Cir. 1998); *Chandler v. Underwriters' Labs, Inc.,* 850 F. Supp. 728, 736 (N.D. Ill.. 1994); *Schneider v. Continental Cas. Co.,* No. 95 C 1820, 1996 U.S. Dist. LEXIS 19631 at 24 (N.D. Ill. Jan. 7, 1997). In *McMahon,* the plaintiff claimed that she remained disabled based on the long commute to work. The court held that her difficulties with the commute to work "while unfortunate, did not make her eligible for benefits." See *McMahon,* 162 F.3d at 40.

In *Chandler,* the plaintiff also claimed that he was disabled based on his commute. The court disagreed, stating:

> It was surely neither arbitrary nor capricious for the Committee to have decided that [the plaintiff] was "able to perform the necessary duties of his desk job and that it was not required to view his inability to get to that job from his home. . . as a disabling condition."
>
> * * *
>
> It is absurd to suggest that it is arbitrary and capricious for the Appeals Committee to have decided that the fortuity of where an employee lives (something within the employee's control unlike a truly medical disability) is not relevant to finding of disability

> under the Plan-a concept that expressly focuses on medically
> disabling conditions.

*See Chandler,* 850 F. Supp. at 738. *See also Schneider, supra.,* (holding that it was neither

arbitrary nor capricious to terminate disability benefits based on the conclusion that the inability

to commute to work was not a necessary function of the job).

For the reasons discussed above and based on these cases, plaintiff is not totally disabled

even if she had difficulties with commuting to work.[3] Plaintiff's job did not involve driving.

Plaintiff was employed as a Technical Web Specialist. (RSL 24). Therefore, any restriction on

driving is irrelevant.

According to her employer, plaintiff's occupation involved occasional standing and

walking and continuous sitting. (RSL 160). These fall within the capabilities identified by Dr.

Grogan in May of 2000. (RSL 57). Plaintiff's job required her to "look up data in catalogues"

and "typing data into PC." (RSL 160). There is nothing in the medical records to explain why

plaintiff could not perform these activities after March 6, 2000. Therefore, she is not totally

disabled.

It is plaintiff's burden to prove her eligibility for benefits. She failed to sustain this

burden by failing to include any information in the administrative record which would explain

why she could not work after March 6, 2000. Nor can plaintiff shift the blame onto defendant

for the lack of supporting evidence. As stated in *Pinto*, there is no duty on the part of the plan

"to gather more information." *Pinto,* 214 F.3d at 394, n.8. The court only has to make sure that

the decision is not "arbitrary and capricious given the information available." *Id.* Here, First

---

[3] This entire issue presupposes that there is no public transportation available to plaintiff, a fact
which is not supported in the administrative record.

Reliance Standard's decision is supported by substantial evidence and was not arbitrary and capricious.  Therefore, the defendant is entitled to judgment in its favor.

## Conclusion

For the reasons stated above, First Reliance Standard is entitled to judgment in its favor. At the time benefits were discontinued on March 6, 2000, plaintiff was no longer under any restrictions that would prevent her from working full time. Therefore, benefits were properly discontinued and Reliance Standard is entitled to summary judgment in its favor.

RAWLE & HENDERSON LLP


By:_____/s/_____
            Joshua Bachrach, Esquire
            Heather J. Holloway, Esquire
            Attorneys for Defendant
            First Reliance Standard Life
            Insurance Company
            The Widener Building
            One South Penn Square
            Philadelphia, PA 19107
            (215) 575-4261

Date:   April 2, 2004