IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____
KRISTEN SMALL                    :
                                 :
    vs.                          :    CIVIL ACTION
                                 :
FIRST RELIANCE STANDARD LIFE     :    NO. 02-CV-3744
INSURANCE COMPANY, et al.        :
_____ :

PLAINTIFF"S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

I.  FINDNINS OF FACT

1. Kristen Small began work for E.M. Science as a Technical Web Specialist on April 20, 1998. (RSL 145).

2. The position is highly-specialized with numerous key responsibilities and job functions.

3. There are numerous documents in the administrative file that set forth the duties and responsibilities of plaintiff's position.

4. For instance, E.M. Science Job Content Document described the position as requiring the following "major activities":

- learning the systems/databases used by other functional groups;
- coordinating the updating of information to the internet with production managers;
- train all EM personnel (Sales, Marketing, CSR, TSR);
- communicating enhancements to the web site;
- developing future enhancements to the website
- creation of catalogs, sell sheets, etc.

(RSL 168).

5. The Job Content Document listed the job functions as follows:

The webmaster will be responsible for maintaining the website in accordance with the strategy set forth by the organization. There are 5 areas to the position. First, the person will be the educator to the other EM personnel as to how we can further use the website to market our products. Training to include training of internal personnel as well as sales reps and distributors. Second, the person will be responsible for data administration. All data will need to be updated on a routine basis. The person will facilitate the content development. Third, the person will handle the administrative portion of the website. This means the person will be responsible for maintaining the budget, and allocating costs. Fourth, the person will be responsible for evaluation of the website. This includes reporting website activity, obtaining user feedback, and generating ideas for improved activity. Lastly, the person will be responsible for chartering the future of the website. This means to determine new links, keep up with

new technologies that may be applicable and interfacing with EMI distributors." (RSL 166).

6. According to the Job Content Document, the candidate "must have excellent written and communication skills. The individual must have excellent PC skills that include a strong proficiency with Word, Excel, Powerpoint, Quark and Pagemaker. The individual must have strong presentation development skills. The individual must have strong presentation graphic arts and design skills. The individual should have prior experience with website design. The individual should have a good familiarity with marketing concepts and a college degree." (RSL 171).

7. Ms. Small's application for long term disability benefits described the physical and mental abilities of the position as: "sitting, writing, typing, walking, math, verbal communications, reasoning, analysis, packing boxes, lifting, walking stairs, data entry, filing." (RSL 148).

8. An Occupational Analysis completed by Ms. Small's employer confirmed the complex nature of the position, stating that the position required the following essential functions: "*frequent*" ability to **"relate to others"**, "*frequent*" **"written and verbal communications"**, "*continuous*" **"reasoning, math, and verbal communications"**, and "*frequent*" ability to **"make independent judgments"**. (RSL 160).

9. An Occupational Assessment conducted by First Reliance identified Ms. Small's position as "Data Base Administrator" and listed aptitudes in the categories of "general learning ability", "verbal aptitude", numerical aptitude", and "clerical aptitude" at either the 67%-89%, or above 89% range. (RSL 177).

10. There is evidence in the administrative file that Ms. Small's medical condition had an impact on her cognitive ability. A claims note states: "When claimant is up during the day, claimant just sits and stares. Brain is not fully awake." (RSL 19).

11. There is no evidence from the testimony of Ms. Winston or from the administrative file itself that First Reliance assessed Ms. Small ability to perform the duties of her position as outlined in the administrative file.

12. In August of 1998, Ms. Small began suffering from chronic fatigue syndrome symptoms, including extreme fatigue, migraines, weight loss, fevers, chills, and joint pain. (RSL 24).

13. Ms. Small first saw an infectious disease specialist, Jeffery Darnall, M.D., in December of 1998. (RSL 25).

14. Dr. Darnall diagnosed Fibromyalgia and Chronic Fatigue Syndrome and certified Ms. Small as unable to work. (RSL 213-214).

15. A letter from Reliance Standard claim examiner, Christine Hanson, dated July 21, 1999 to Dr. Darnall confirmed the diagnosis of Chronic Fatigue Syndrome and requested that he furnish his treatment records. (RSL 234).

16. Ms. Small also came under the care of neurologist, Bruce Bogdanoff, M.D. in January of 1999. Dr. Bogdanoff diagnosed migraines with aura, and these diagnoses were again confirmed by Ms. Hanson in a letter to Dr. Bogdanoff dated July 21, 1999 requesting his treatment records. (RSL 251, 253).

17. Ms. Hanson confirmed a diagnosis of Hypermobility Syndrome of rheumatologist, Dr. Bergman. (RSL 260, 262).

18. Dr. Bogdanoff referred Ms. Small to a sleep disorder specialist, Wendell Grogan. Dr. Grogan first saw Ms. Small on January 13, 1999. In his initial report, Dr. Grogan stated: "Chronic Fatigue and the so called fibromyalgia syndrome are associated with specific sleep disturbance patterns, most commonly periodic limb movement disorder, which would be consistent with her known restlessness and also the so called alpha/delta or alpha intrusion sleep disorder. (RSL 277).

19. Dr. Grogan described a sleep latency study performed in February of 1999 as abnormal, demonstrating hypersomnia and a low sleep efficiency (i.e., lack of sleep onset REM). (RSL 154, 240). The study was indicative of primary hypersomnia or chronic sleep deprivation. (RSL 240). Dr. Grogan's diagnoses were idiopathic hypersomnia disorder and daytime hypersomnia due to periodic limb movements. (RSL 150-151, 154).

20. Throughout the entire time the claim was under consideration, Ms. Small's medical condition was not under control and required consistent and prescribed medical monitoring and management. Notes in the claim file confirm that defendant was aware of this aspect of Ms. Small's condition and the impact on her daily activities. (RSL 17-19). Indeed, claims examiner Hanson noted a conversation with Ms. Small: "Will this

3

resolve gradually. Not sure different for different people. She is hoping to get better in the next three months.". (RSL 19).

21.  Ms. Small's course of care with Dr. Grogan included:

- In February 1999, Ms. Small was medicated with Clonopin (.5 mg), with instructions for follow-up in six weeks to review response to treatment. (RSL 154)

- In April 1999, Ms. Small was sleeping from 11 p.m. to 7:30 a.m., and then 2 ½ hour nap at around 2 p.m., with fatigue the rest of the day. She reported that Clonopin was not effectively sedating, although the dose was increased to 1 mg. Her medication was changed to Provigil (10 mg) with follow-up directed in another six weeks. (RSL 153)

- In May 1999, Ms. Small reported going to bed at 10 p.m. and awaking at 8 a.m. feeling tired and continued the afternoon naps. She was instructed to change her medication to first thing in the morning with another afternoon dosage and to follow-up in another six weeks. (RSL 152)

- In June 1999, the Provigil was increased to 20 mg, twice a day, but there was significant side effects, including a 15 pound weight loss. The afternoon naps and night time restlessness continued. Follow-up was directed in one month. (RSL 83).

- In July 1999, Ms. Small continued with a poor appetite, poor concentration. Provigil was discontinued and, while her fatigue worsened, her weigh loss stabilized. She continued on her Clonopin, and continued with afternoon naps. (RSL 49).

- In November 1999, Ms. Small's sleep patterns were to go to bed around 8-9 p.m., to about 10 to 12 noon the next day, with fatigue in the afternoon. Dr. Grogan ordered a repeat sleep study to assess the efficacy of the Clonopin and to determine whether a day time stimulant was indicated. (RSL 47).

- In January 2000, the sleep study was reported as continuing to indicate an abnormal period limb movement and considerable circadian rhythm problem. A new drug, Sonata, was ordered as well as Krono therapy. Follow-up was ordered in one month. (RSL 42, 46)

- In February 2000, Ms. Small is sleeping from 10 p.m. to 8 a.m., but still experiences fatigue in the afternoon necessitating a 4 to 5 hour nap in the afternoon. A trial of Addernall (5 mg) was started with a target dosage to 20 mg as necessary. Follow-up was ordered in one month. (RSL 45)

- In March 2000, Ms Small was continuing the Addernall and Clonopin and was sleeping from 8 p.m. to 7 a.m., encountering sleep inertia when awake. Follow-up was ordered in three months time. (RSL 43)

- In June 2000, Ms. Small's medications were altered again with the Adernall being reduced to 2.5 mg per day without any difference. The afternoon naps from 2 to 4 hours continued. She slept from 10 p.m. to 10 a.m. Dr. Grogan continued the Clonopin, but prescribed a stimulant, Ritalin (10 mg in the morning and 10 mg in the afternoon), to help with promote day time alertness. Follow-up was ordered for one month. (Office Notes of Wendell Grogan, 6/5/00).

22.  Despite the fact that the medical reports of Dr. Grogan plainly indicated that Ms. Small was continuing with follow-up visits with Dr. Grogan, Ms. Winston did not request or obtain the medical records of

4

Dr. Grogan following the March 6, 2000 visit.

23. Ms. Winston undertook additional work-up while the matter was on review, including gathering additional medical records, having Dr. Grogan complete a Physical Capacities Assessment.

24. Ms. Winston relied on these new materials as well as the nursing reviews that she undertook when issuing her denial decision on review.

25. Plaintiff was never informed what specific records she had obtained from Grogan , nor did plaintiff have any opportunity to respond to, comment upon, or supplement the information Winston obtained.

26. Ms. Winston told plaintiff in the only letter (dated May 22, 2000 )she wrote before the denial decision that Winston "was awaiting additional information and medical records from Dr. Grogan. We will contact you in the near future with an update or to inform you if additional information will be required." (RSL 64).

27. Defendant did not contact plaintiff with an up-date or to inform her that additional information was required.

28. There is no explicit grant of authority in the policies and procedures manual that authorized Winston to obtain additional medical materials on her level of review.

29 Ms. Winston testified that she was never advised verbally by any supervisor that she could do so. When asked upon what authority she obtained the records, Winston testified that, when the medical department requests additional records, they are permitted to obtain them.  Again, when asked to point to a specific grant of authority in the policies and procedures handbook, she could not do so.

30. Ms. Winston requested and obtained more than just the records requested by the medical department and did not obtain all the records requested by the medical department.

31. In the medical review of 5/18/00, nurse Finigan advised Winston to: "Please obtain the results of the sleep study and office notes from 8/99 to present for review." (RSL 65). Winston in fact obtained a Physical Capacities Statement (RSL 57-58) which was <u>not</u> a record asked for by Finigan. Moreover, Winston did not obtain Grogan's June 5, 2000 office note, a record clearly available to Winston before she forwarded the medical information to Finigan on June 21, 2000 and made her denial on the same day (RSL 36).

32. Winston testified that she relied on the PCS when deciding the claim.

33. There are two policies and procedures in the manual that pertain to a claimant's rights on appeal.

34. Under E1.3 #3, it is provided that "Claimants shall be provided upon request and free of charge reasonable access to and copies of all documents records and other information relevant to the claimant's claim for benefits." Here, plaintiff was not given reasonable access. Indeed, she was not even advised that she had such a right of reasonable access. At best, Ms. Hanson advised her in the original denial letter that plaintiff was "entitled to review the pertinent documents upon which our determination *was* predicated". (RSL 78). On its face, this notification grants plaintiff only the right to review documents predicating the original initial denial, not any records defendant received or reviewed on appeal. This notification stands in contrast to the form letter Attachment 2 in the policies and procedures manual which does contain the language mirroring E1.3 #3. Plaintiff was never advised of her right to request access to the new information.

35. Policy E1.3 #2 provides that: "Claimants shall be provided with the opportunity to submit written comments documents records and/or other information relating to the claim for benefits in conjunction with their timely appeal".

36. Plaintiff was told in the only letter to her by Winston before the denial letter of June 21, 2000 that Winston "was awaiting additional information and medical records from Dr. Grogan. We will contact you in the near future with an update or to inform you if additional information will be required." (RSL 64). There was no contact until the denial letter of June 21, and it was in that denial letter that plaintiff was informed that Winston received and relied upon additional medical materials.

37. When advised in her initial denial letter that she could submit additional information, plaintiff did so. She submitted three records along with her letter of appeal (RSL 70-72).

38. However, in Winston's letter of May 22, 2000, plaintiff was told that *defendant* was getting Dr. Grogan's records. She had no way of knowing that defendant did not seek or obtain the June 5, 2000 office note. Plaintiff never received an update or a request for additional information as promised by Winston in her 5/22/00 letter. The only time the information received by defendant was identified was in the June 21, 2000 denial letter, and by that time, plaintiff did not have any recourse to submit any additional information or

6

comment.

39. Dr. Grogan expressed his opinion that Ms. Small was disabled from work on several occasions. His first Physician's Statement of Disability, dated June 3, 1999, significantly limited Ms. Small in all physical categories to "occasional", that is, from 0% to 33% of the time. (RSL 151). Dr. Grogan did <u>not</u> state that Ms. Small reached maximum medical improvement.

40. In a letter dated October 8, 1999, Dr. Grogan again stated that Ms. Small could not work a full time job, and went on to state that even sedentary work would implausible. (RSL 71).

41. In a February 2, 2002 letter, Dr. Grogan repeated his opinion that Ms. Small was not employable. (RSL 44). In a Physical Capacity Assessment Form, signed and completed on May 22, 2000 (but predicated upon the office visit of March 6, 2000), Dr. Grogan stated that Ms. Small could perform categories of physical abilities "continuously", that is, 67% to 100% of the time. However, he stated that Ms. Small could not drive at all. To the question, "Any other factors affecting the patient's physical abilities?", Dr. Grogan wrote: "pathological hypersomnia". (RSL 57-58). In all of the reports, Dr. Grogan made it clear that Ms. Small's condition was not under control and that her treatment was on-going (*e.g.*, "My hope is that with further treatment you will begin to improve, but this is yet to be determined".) (RSL 71).

42. There is no medical evidence in the administrative file that Ms. Small had reached maximum medical improvement, nor did Dr. Grogan ever expressly release Ms. Small for full time work of any capacity. (Exhibit "B" at 56-60).

43. The *only* medical assessment performed on this claim was done by Barbara Finigan, R.N., a nurse employed by defendant in its medical department.

44. The decision-maker on the claim, Dorothy Winston, testified that she relied exclusively on nurse Finigan to explain and assess the physical and non-physical consequences of plaintiff's medical condition and assess plaintiff's capacity to perform her regular occupation -- the standard for determining disability under the policy language itself.

45. By her own admission, Ms. Winston did not have a working knowledge of hypersomnia disorder or periodic leg movement disorder. She never evaluated such medical conditions before or since the claim at issue

46. Ms. Winston freely admitted that she understood at the time that plaintiff's medical conditions involved more than simply difficulty in sleeping and staying awake.

47. She further acknowledged that she knew plaintiff's job required significant aptitudes and non-physical skills. However, Ms. Winston stated that she did not bring any independent analysis to these issues most notably because she could not. Rather she relied on the nursing assessment to address these issues.

48. Nurse Finigan never assessed Ms. Small's ability to perform the tasks and duties documented in the administrative file.

49. Nurse Finigan gave the medical evidence the most narrow interpretation, and, in places, her opinion is completely inconsistent on its face.

50. In her first review conducted on 9/2/99, she opined: "medicals support work impairment from 1/7/99 through 6/3/99 - treating physician has documented full time sedentary capacity". (RSL 232). When opining that the treating doctor released plaintiff for full time sedentary work, nurse Finigan is obviously referencing and interpreting Dr. Grogan's June 3, 1999 Attending Physician Statement. (RSL 27-28). However, on that form, Dr. Grogan did not expressly release plaintiff to perform sedentary work. Indeed, he limited much of her physical capabilities to the "occasional" level, and stated only that she could lift/carry 10 pounds maximum and occasionally carry small objects in an 8-hour day. From that information, nurse Finigan opined that Dr. Grogan released plaintiff to full time sedentary work. However, the form does not do so. Indeed, the form states that plaintiff had not achieved maximum medical improvement, and did not provide a return-to-work date.

51. Dorothy Winston agreed with these observations which contradict nurse Finigan's opinion.

52. In her next assessment of 11/3/99, nurse Finigan again references the 6/3/99 full time sedentary work date. It echos the first assessment: "As stated before, medicals support till 6/3/99 when treating physician provided full time sedentary capabilities". (RSL 173). However, she then writes inconsistently that "12/1/98 to 5/30/99 less than sedentary - 5/30/99 - full time sedentary". There is no telling where nurse Finigan got the 5/30/99 date and why she opined that plaintiff had sedentary capability from 5.30/99 and not 6/3/99. It is

notable that the "elimination period" ended on 5/30/99, and defendant did not have any obligation to pay benefits even if plaintiff was totally disabled during any period prior to that time. If nurse Finigan's 5/30/99 date was accepted, it would have effectively resulted in no financial obligation to defendant, her employer.

53. In her third assessment, this one on 5/18/00 after the matter was appealed, nurse Finigan maintained her prior opinion. She wrote: "Prior meds provided by attending physician indicate continued treatment for condition. However, 6/3/99 treating physician provided full time sedentary capabilities." (RSL 65). Nurse Finigan stood by her earlier opinion even though being given for review Dr. Grogan's 10/18/99 report (RSL 71) in which he stated: "In terms of work restrictions, the fact that you have this persistent hypersomnia makes it difficult for me to see how you could engage in any full time job. This would be especially difficult if there were any technical or hazardous materials involved in your work". She also had the 2/2/00 note which stated: "Given this continued problem, I would again recommend that you not be employed until we can make more inroads into the familial hypersomnia syndrome". (RSL 72).

54. Nurse Finigan stuck by her earlier interpretation of the 6/3/99 APS which she says released plaintiff for full time sedentary work even in the wake of clear evidence to the contrary.

55. The final review was performed on the same day that she received the new materials and the same day the denial letter was written and states: " It appears as of 2/2/00 claimant made significant improvement that would allow for a return to work." (RSL 36).

56. This opinion contradicted the clear medical opinion of Dr. Grogan expressed in his 2/2/00 letter at RSL 72 which states that plaintiff could not work. Nurse Finigan's opinion cannot be reconciled with the clearly expressed opinion of Dr. Grogan.

57. If Winston did not have any independent knowledge or familiarity of the medical conditions under review as she admitted and if she had to rely on nurse Finigan, there are aspects to the nursing review which are suspect and should have caused a reasonable plan administrator to question the trustworthiness of the assessment.

58. For example, nurse Finigan did not explain the significance to Dr. Grogan's instruction that she be followed in three months time, did not explain the medications and efficacy of them, did not explain the nuances

of the affliction, did not assess the restrictions, limitations, and capabilities as they related to the actual material job duties of plaintiff's regular occupation, did not explain the non-physical symptoms associated with plaintiff's condition -- all areas on which Winston testified that she had relied on Finigan to assess.

59. Winston herself did not feel Finigan's opinion was sound enough to adopt it – Winston did not cut off benefits as of 2/2/00 as opined by Finigan.

60. The decision to depart from nurse Finigan's opinion by Winston contradicts her testimony that she was dependent upon the nurse to assess and assimilate medical information. If that is true, Winston could not have reasonably departed from the nurse's 2/2/00 cut off date. The rationale must necessarily be predicated upon Winston's independent assessment – a proposition which she herself admitted that she was not capable of giving.

61. Defendant did not give plaintiff the opportunity to respond or comment or supplement it after receiving the new information when the matter was under consideration by Winston.

62. Defendant agreed to provide plaintiff an "update" although it never did so.

63. Twenty-eight (28) days passed between May 24, 2000 (the date that Winston received Grogan's latest records) (RSL 37) and June 21, 2000 (the date that Winston forwarded the information to Finigan for review) (RSL 36) without a single thing being done on the file.

64. Out of the 113 days between the March 8, 2000 date on which defendant received plaintiff's appeal letter (RSL 68) and the June 21, 2000 date of the denial letter, the only activity on the claim was during a six (6) day period between May 18th and May 24th.

65. To qualify for benefits, the policy language requires that a person must be unable to perform the material duties of her regular occupation. (RSL 117).

66. According to our Third Circuit Court of Appeals, the language, "regular occupation", is not ambiguous and means the actual work the plaintiff was performing in her normal job before the disability. Lasser vs. Reliance Standard Life Insurance Co., 344 F.3d 381, 385-86 (3d Cir. 2003).

67. The administrative file is replete with information confirming the complex and technical nature of plaintiff's material duties as a Technical Web Specialist.

68. The materials delineating these duties are the Employer's Statement, Claimant's statement, Job Content Description, and DOL description. (RSL 171, 175-77, 148, 166, 168, 160).

69. When asked whether she was aware that plaintiff's job entailed non-physical skills and aptitudes, Ms. Winston confirmed that she did indeed possess this information. When asked how she assessed plaintiff's ability to perform the material duties of her regular occupation, Ms. Winston answered that she relied on the medical department and Dr. Grogan.

70. In the final analysis, there is absolutely no assessment of plaintiff's fitness to perform the material duties of her regular occupation. The medical department did not comment on plaintiff's ability to perform her actual work. Indeed, as confirmed by Ms. Winston, nurse Finigan was never even sent any of the occupational descriptions in the claim file and therefore could not have commented on this issue with any degree of reliability. Nonetheless, none of nurse Finigan's medical assessments say anything at all about plaintiff's ability to perform her actual work.

71. This is especially significant given that the policy language would still entitle plaintiff to benefits even is she could perform <u>some</u> of the material duties of her regular work on a full time basis. (RSL 117). Thus, assuming *arguendo* that plaintiff could sit for eight-hours, if she could only perform this and <u>some</u> of her material duties on a full time basis, she would still be entitled to benefits. Simply concluding that plaintiff was capability of sitting for 8-hours without an assessment of whether plaintiff could perform the material duties of her position does not disqualify plaintiff for benefits under the definition of disability in the policy.

72. Dr. Grogan did not clear plaintiff to perform her actual work. In neither the 6/3/00 APS (RSL 27) nor the PCS (RSL 57) nor any other record did Dr. Grogan opine that plaintiff was capable of performing the material duties of her regular position. Indeed, Dr. Grogan never rescinded or deviated from the opinion that she could not perform technical work. (RSL 71). This is most evident in restricting plaintiff to no driving whatsoever. (RSL 57).

73. The administrative record stands in stark contrast to Ms. Winston's testimony. The two sources Ms. Winston cited to as those on which plaintiff's ability to perform the material duties of her regular job was assessed do not make such assessment. Neither nurse Finigan nor Dr. Grogan ever cleared plaintiff to return to

11

her actual job, and, at best, the medical assessments in the file say nothing more than the fact that plaintiff could perform a sit down job. However, there is no evidence contradicting Dr. Grogan's restrictions (RSL 71, 57) against any technical activities (driving included), and plaintiff's position clearly entailed the performance of technical duties more than the ability to sit.

II.     CONCLUSIONS OF LAW

   1. A heightened arbitrary and capricious standard of review applies to the decision to discontinue benefits.

   2. Based upon evidence of "conflict", the administrative decision is examined under a "high degree of skepticism" standard which allows the Court to afford very little deference.

   3. The decision to deny benefits is arbitrary and capricious and is reversed.

   4. Even under a standard that would afford greater deference, the decision is arbitrary and capricious.

                    Respectfully submitted:

                    **LAW OFFICES OF VINCENT F. PRESTO**

By:     _____
                    VINCENT F. PRESTO, ESQUIRE

                    124 Chestnut Street
                    Philadelphia, PA 19106
                    (215) 922-7000

                    Attorneys for Plaintiff

<u>CERTIFICATE OF SERVICE</u>

      I, Vincent F. Presto, Esquire, hereby certify that I served a true and correct copy of this Plaintiff's Proposed Findings of Fact and Conclusions of Law upon the person(s) set forth below on the date indicated via United States regular mail.

  Heather Holloway, Esquire
RAWLE & HENDERSON, L.L.P.
The Widener Building
One South Penn Square
Philadelphia, PA 19107

                                                _____
                                                VINCENT F. PRESTO, ESQUIRE

Date: _____

February 1, 2005

Heather Holloway, Esquire
RAWLE & HENDERSON, L.L.P.
The Widener Building
One South Penn Square
Philadelphia, PA 19107

   Re:   Small vs. First Reliance

Dear Ms. Holloway:

   Enclosed please find Plaintiff's Proposed Findings of Fact and Conclusions of Law which were filed late today with the Clerk.

        Very truly yours,


        VINCENT F. PRESTO


VFP: rf
Encls.

February 1, 2005

Best Buy Rebate #54683
P.O. Box 7400
Calais, ME  4619-7408

Dear Sir/ Madam:

    Enclosed please find the Rebate Form, modem receipt, and account number.  Please know that I was not sent a confirmatory e-mail and I was told that a duplicate Order Form could not be printed.  I contacted Comcast and they advised that they could not forward any confirmation because it was not their promotion.

        Very truly yours,


        VINCENT F. PRESTO


VFP:  rf
Encls.

February 1, 2005

Honorable Juan Sanchez
United States Courthouse
Room 20613
601 Market Street
Philadelphia, PA 19106

    Re:    Small vs. First Reliance Standard Insurance Co.; 02-3744

Dear Judge Sanchez:

    Enclosed please find a courtesy copy of plaintiff's Proposed Findings of Fact and Conclusions of Law, the original of which has been filed with the Clerk.

                                  Respectfully,

                                  VINCENT F. PRESTO

VFP: rf
cc:    Heather Holloway, Esquire (w/ encls.)