IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KRISTEN SMALL | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 02-3744 |
| | : | |
| | : | |
| FIRST RELIANCE STANDARD LIFE | : | |
| INSURANCE COMPANY, E.M. | : | |
| INDUSTRIES, INC., and E.M. | : | |
| SCIENCE | : | |

## MEMORANDUM AND ORDER

**Juan R. Sánchez, J.**                                              **February 28, 2005**

_____Plaintiff, Kristen Small ("Small"), claims First Reliance Standard Life Insurance Company ("First Reliance"), E.M. Industries, Inc., and E.M. Science (collectively "Defendants"), violated the Employee Retirement Income Security Act of 1974[1] ("ERISA") by denying her claim for long-term disability benefits. Defendants claim Small was disabled until March 6, 2000 and is not entitled to long-term disability benefits beyond that date. After a non-jury trial, this Court enters judgment for Small. The following constitutes this Court's findings of fact and conclusions of law.[2]

## FACTS

_____

[1] 29 U.S.C. §§ 1001, *et seq.*

[2] The findings of fact and conclusions of law are made after applying a heightened arbitrary and capricious standard of review to the administrative record. Findings of fact and conclusions of law are necessary after a non-jury trial. Fed.R.Civ.P. 52(a); *see also Kosiba v. Merck & Co.*, 384 F.3d 58, 61 (3d Cir. 2004).

1

Small began working for E.M. Science, a division of E.M. Industries, Inc., as a Technical Web Specialist on April 20, 1998. Her duties included learning the systems and databases other functional groups used, coordinating the updating of information to the internet with production managers, training other personnel, communicating and developing future enhancements to the company's website, and creating catalogs and sell sheets. Small worked for E.M. Science until December 1, 1998 when she filed an application for long-term disability benefits with First Reliance, who provided long-term disability coverage to eligible E.M. Industries employees.[3] Small claimed on her disability application she suffered extreme fatigue, migraines, weight loss, fevers, chills, and joint pain and that these symptoms prevented her from performing the material duties of her job. (A.R. 145).

Small's symptoms of chronic fatigue syndrome began in August 1998. She saw an infectious

---

[3]The definition of total disability in First Reliance's group policy is:
"Totally Disabled" and "Total Disability" mean, with respect to Class II and III, that as a result of an Injury or Sickness:
(1) During the Elimination Period and for the first 60 months for which a monthly benefit is payable, an Insured cannot perform the material duties of his/her regular occupation;
(a) "Partially Disabled" and "Partial Disability" mean that as a result of Injury or Sickness an Insured is capable of performing the material duties of his/her regular occupation on a part-time basis or some of the material duties on a full-time basis. An Insured who is partially disabled will be considered totally disabled, except during the elimination period;
(b) "Residual Disability" means being partially disabled during the elimination period. Residual Disability will be considered Total Disability; and
(2) After a monthly benefit has been paid for 60 months, an Insured cannot perform the material duties of any occupation. Any occupation is one that the insured's education, training or experience will reasonably allow. We consider the Insured "Totally Disabled" if due to an Injury or Sickness he or she is capable of only performing the material duties on a part-time basis or part of the material duties on a full-time basis.

disease specialist, Jeffery Darnall, M.D., in December 1998. Dr. Darnall diagnosed Small with Fibromyalgia and Chronic Fatigue Syndrome and opined she was unable to work. (A.R. 213-214). Small came under the care of a neurologist, Bruce Bogdanoff, M.D., in January of 1999. Dr. Bogdanoff diagnosed Small with migraines with aura and referred her to sleep disorder specialist, Wendell Grogan, M.D. (A.R. 251). Dr. Grogan first saw Small on January 13, 1999 and treated Small throughout her claim for long-term disability benefits. On February 19, 1999, Dr. Grogan described Small's sleep study as abnormal and diagnosed her with idiopathic hypersomnia disorder and daytime hypersomnia due to periodic limb movements. (A.R. 150-51, 154).

Because Small continuously had problems staying awake for prolonged periods of time, Dr. Grogan's care was continuous and his reports are summarized as follows. Dr. Grogan recorded on April 5, 1999, Small was sleeping from 11 p.m. to 7:30 a.m. with a two and one half hour nap around 2 p.m. Small's sleeping patterns remained relatively unchanged during her May 14, 1999 and June 25, 1999 visits, but her fatigue worsened by July 23, 1999. (A.R. 49, 83, 152). On November 10, 1999, Small was sleeping from 8-9 p.m. to about 11 a.m. with fatigue throughout the afternoon. (A.R. 47). On January 12, 2000, Small's sleep study indicated abnormal periodic limb movement and by February 2, 2000 she had not experienced any improvement in her daytime alertness. (A.R. 42, 45-46).

On March 6, 2000, Small displayed some improvement and was sleeping from 8 p.m. to 7 a.m. and generally felt alert during the daytime hours. Small, however, still awoke with sleep inertia and Dr. Grogan, hoping to normalize her sleep cycles, ordered a follow-up visit in three months.

(A.R. 43). Dr. Grogan observed during Small's June 5, 2000 visit[4] that she was now sleeping from 10 p.m. to 10 a.m. and took two to four hour naps in the afternoon. Her condition regressed from March 6, 2000 to June 5, 2000.

Small included with her December 1, 1998 benefits application a Physician's Statement Dr. Grogan completed on June 3, 1999. Dr. Grogan said in the statement that in an eight hour day, Small was capable of sitting, standing and walking for one to three hours and was capable of lifting and carrying at a sedentary level. (A.R. 151). After reviewing Small's application and medical records, First Reliance granted her long-term disability benefits until June 3, 1999. Examiner Christine Hanson said in her January 13, 2000 decision letter that "Dr. Grogan indicated . . . you were capable of fulltime sedentary work. Since you were capable of sedentary work as of June 3, 1999 you no longer met the definition of total disability contained in policy LSC 63591. Therefore benefits are denied as of that date." (A.R. 74-75).

Small appealed First Reliance's decision on February 11, 2000 and, in support of her appeal, included Dr. Grogan's February 2, 2000 report stating she continued to have severe daytime sleepiness. Small received a letter on March 28, 2000 from First Reliance acknowledging her appeal, stating First Reliance would contact her if more information was needed, and advising Small to send any additional information regarding her condition. (A.R. 67). Small subsequently sent Dr. Grogan's reports through March 6, 2000 and received another letter from First Reliance dated May 22, 2000. In that letter, Dorothy Winston, the person handling the appeal, said, "[w]e are still in the process of completing our review and we are awaiting additional information and medical records

---

[4]Dr. Grogan's report from this office visit was not included in the administrative record, but this Court's December 17, 2004 Order admitted his report as extrinsic evidence to help determine the proper standard of review.

from Dr. Grogan.  We will be contacting you in the near future with an update or to inform you if additional information will be required." (A.R. 64).

Winston had Dr. Grogan complete another Physical Capacities Statement on May 22, 2000. In that statement, Dr. Grogan indicated Small could now continuously sit, stand and walk, should never drive, and could perform light level work.[5]  He also indicated pathological hypersomnia was affecting Small's physical abilities. (A.R. 57-58).  Although Small saw Dr. Grogan again on June 5, 2000, Winston did not consider Dr. Grogan's report from this office visit in her final determination.[6] On June 21, 2000, after at least a month of inactivity, First Reliance's medical staff requested Small's medical records, Winston sent the records, a review was conducted, and the denial letter was mailed, all on the same day.  In its denial letter, First Reliance said it was reversing its earlier decision to deny Small's LTD benefits beyond June 3, 1999.  The new decision found Small eligible for benefits up to March 6, 2000.

In the letter, Winston cited Dr. Grogan's March 6, 2000 report, which found Small able to stay awake from about 7 a.m. to 8 p.m.  Winston said this report found Small was tolerating her medications and Dr. Grogan hoped that by normalizing Small's sleep cycles, she would be able to sustain her progress without medication in the future. (A.R. 32-33).  Winston also said her decision was based on the Physical Capacities report Dr. Grogan completed, which indicated Small could physically perform light level work.  Winston said, according to Small's employer, her occupation

---

[5]Light level work on the Physical Capacities Statement is described as lifting 20 pounds maximum, and/or includes significant standing and walking.

[6]This visit is noteworthy because Small's condition deteriorated by June 5, 2000.  First Reliance never considered Dr. Grogan's June 5, 2000 report, even though the final determination was not made until June 21, 2000.  First Reliance claimed Small never sent this report to them and it was, therefore, not part of the administrative record.

is sedentary and Dr. Grogan cleared her for such work. (A.R. 33).  Lastly, Winston said the entire

file was reviewed by the medical staff, Barbara Finigan, R.N. (A.R. 33-34).  Finigan provided the

medical review for both the initial application and during the appeal and consistently opined Small

was not disabled as of June 3, 1999. (A.R. 65, 173).

**DISCUSSION**

Although ERISA does not provide a standard of review for the denial of benefits,

the Supreme Court addressed the issue in *Firestone Tire and Rubber Co. v. Bruch* and stated:

> a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de
> novo standard unless the benefit plan gives the administrator or fiduciary
> discretionary authority to determine eligibility for benefits or to construe the terms
> of the plan . . . .  Of course, if a benefit plan gives discretion to an administrator or
> fiduciary who is operating under a conflict of interest, that conflict must be weighed
> as a facto[r] in determining whether there is an abuse of discretion.

489 U.S. 101, 115 (1989).  The Third Circuit subsequently held that when the language of a plan

gives the administrator discretionary authority, courts must apply the arbitrary and capricious

standard of review.[7] *Abnathya v. Hoffmann-La Roche,* Inc., 2 F.3d 40, 45 (3d Cir. 1993).  "Under the

arbitrary and capricious standard, an administrator's decision will only be overturned if it is without

reason, unsupported by substantial evidence or erroneous as a matter of law [and] the court is not

free to substitute its own judgment for that of the defendants in determining eligibility for plan

benefits." *Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377, 387 (3d Cir. 2000) (holding ERISA

---

[7] The "arbitrary and capricious" standard is essentially the same as the "abuse of discretion"
standard. *Abnathya v. Hoffmann-La Roche,* Inc., 2 F.3d 40, 45 n.4 (3d Cir. 1993); *Nazay v. Miller,*
949 F.2d 1323, 1336 (3d Cir.1991).

does not make judges decision-makers, but merely assures appropriate procedure is followed).

The Third Circuit further held a heightened arbitrary and capricious standard is required when an insurance company both administers and funds the benefits plan. *Pinto*, 214 F.3d at 388. A higher standard of review is necessary because the "potential self-dealing [by the insurance company] warrants that [the] fiduciary insurer's decisions be closely inspected."[8] *Id.*

There is an inherent conflict of interest when an insurance company determines ERISA claims and pays such claims from its own funds. *Id.* After determining a heightened arbitrary and capricious standard is necessary in these situations, the Third Circuit held district courts must apply a "sliding scale" approach. This approach requires the intensity of a court's review to increase in proportion to the intensity of the conflict. *Id.* at 393. The Third Circuit instructed lower courts to consider not only the reasonableness of the result, but also the process by which the result was achieved. *Id.* "Suspicious events" and "procedural anomalies" raise the likelihood of self-dealing and move the review toward the stricter extreme of the arbitrary and capricious range.[9] *Id.* at 394. A court may apply the least deferential standard of review, "high degree of skepticism," when the

---

[8]The Third Circuit laid out its reasoning for requiring closer scrutiny of insurance companies' decisions in such self-dealing positions. The Court stated, "ERISA litigation generally arises only in close cases, and there would seem to be insufficient incentive for the carrier to treat borderline cases . . . with the level of attentiveness and solicitude that Congress imagined when it created ERISA "fiduciaries." Rather, insurance carriers have an active incentive to deny close claims in order to keep costs down and keep themselves competitive so that companies will choose to use them as their insurers . . . ." *Pinto*, 214 F.3d at 388.

[9]Although the *Pinto* Court imposes a more searching standard of review on self-interested administrators, the Third Circuit held a conflicted administrator is not required to make a good faith investigation of a claim and has no duty to gather more information. Doing so would shift the burden of proof from the claimant to the administrator. *Pinto*, 214 F.3d at 394 n.8.

evidence demonstrates bias, procedural irregularities, or inconsistent treatment of factual information.[10] *Pinto*, 214 F.3d at 393-94.

A conflict exists and a more searching scrutiny is required where "the impartiality of the administrator is called into question." *Goldstein v. Johnson & Johnson*, 251 F.3d 433, 435 (3d Cir. 2001). Partiality can arise either because "the structure of the plan itself inherently creates a conflict of interest, or because the beneficiary has put forth specific evidence of bias or bad faith in his or her particular case." *Id.* at 435-36. In this case, both examples of partiality exist. A heightened arbitrary and capricious standard of review applies because First Reliance had discretionary authority, administered, and funded the plan. In light of the procedural irregularities in this case, this Court will adjust the "sliding scale" to the least deferential side and apply the "high degree of skepticism" standard. This Court will scrutinize First Reliance's decision with a "high degree of skepticism" for two reasons: 1) First Reliance selectively used medical information and 2) inadequately assessed Small's ability to perform the material duties of her job.

The procedural irregularities in this case raise this Court's suspicion and its level of scrutiny. The selective use of information for self-serving reasons is an irregularity that will ratchet a court's review upward. *Pinto*, 214 F.3d at 393-94. First Reliance's final decision to deny Small benefits as of March 6, 2000, was predicated on evidence selectively chosen. Small was under Dr. Grogan's

---

[10]The Third Circuit acknowledges "there is something intellectually unsatisfying, or at least discomforting, in describing [the] review as a 'heightened arbitrary and capricious' standard." *Pinto*, 214 F.3d at 392. The Court provides guidance by stating "the . . . standard may be a range, not a point . . . [it is] more penetrating the greater is the suspicion of partiality, less penetrating the smaller that suspicion is." *Id.* at 392-93 (quoting *Wilbur v. ARCO Chem. Co.*, 974 F.2d 631, 638 (5th Cir. 1992).

care throughout the application process, from January 13, 1999 through June 21, 2000, the day her appeal was denied. Dr. Grogan assessed Small's condition at least ten times and repeatedly opined she was having significant sleeping problems. First Reliance selectively placed greater emphasis on the March 6, 2000 report because it documented a modest improvement to Small's condition. A brief overview of Dr. Grogan's reports is provided below to highlight First Reliance's selective use of information.

On February 19, 1999, Dr. Grogan diagnosed Small with idiopathic hypersomnia disorder after her sleep study a month prior. On April 5, 1999, Dr. Grogan found Small needed daily two to four hour naps in the afternoon. Dr. Grogan recorded on May 14, 1999 that Small still took these afternoon naps, although she was somewhat more alert. On June 3, 1999, Dr. Grogan completed a Physician's Statement which said Small was only capable of sitting, standing and walking for only one to three hours per working day. In another office visit a few weeks later, Dr. Grogan found Small was suffering weight loss and her afternoon naps and night time restlessness continued. On July 23, 1999, Small was experiencing more fatigue, but her weight loss was stabilized. During her next visit on November 10, 1999, Dr. Grogan found no improvement and ordered a repeat sleep study. On January 12, 2000, Dr. Grogan found Small still had significant problems sleeping and recommended a different therapy. When Small returned on February 2, 2000 for Dr. Grogan to assess the therapy's effectiveness, he found she was not experiencing any significant improvement in her daytime alertness.

In his March 6, 2000 report, the report First Reliance relied on to deny Small's appeal, Dr. Grogan found Small was now able to stay awake from 7 a.m. to 8 p.m. Dr. Grogan also noted she was tolerating her medications, but was awaking with a great deal of sleep inertia and he hoped to

normalize her sleep cycles in the future.  First Reliance determined this report cleared Small for work, even though Dr. Grogan made no such reference.  Small's next visit to Dr. Grogan on June 5, 2000 indicated her condition significantly regressed from her minor improvement in March.[11]  First Reliance selectively interpreted Dr. Grogan's March 6, 2000 report to opportunistically deny Small's claim.  Small suffered from a severe sleeping disorder throughout the claim process, as evidenced with Dr. Grogan's reports.  First Reliance self-servingly interpreted Small's modest improvement in March of 2000 and determined she was capable of working, despite Small's medical history to the contrary.

Another irregularity with First Reliance's final decision was its inadequate assessment of Small's ability to perform the material duties of her job.  First Reliance's policy states, "[w]e consider the Insured 'Totally Disabled' if due to an Injury or Sickness he or she is capable of only performing the **material duties** on a part-time basis or part of the **material duties** on a full-time basis." (emphasis added).  First Reliance determined Small was capable of sedentary work based on Dr. Grogan's Physical Capacities report. (A.R. 57).  In this report, Dr. Grogan only comments on Small's ability to sit, stand, walk, and other physical abilities.  He does not, however, comment on Small's cognitive capacity and her ability to perform her job.  First Reliance was quick to determine Small's

---

[11]Although First Reliance claims the June 5, 2000 office visit is not part of the administrative record and should not be considered, this Court admitted it into evidence in its December 17, 2004 Order.  In conducting our review of the administrator's decision, this Court must look to the "record as a whole," which is the evidence that was before the administrator when she made the determination to deny benefits. *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 440 (3d Cir. 1997). This Court may, however, examine evidence outside of the administrative record to determine whether there is a conflict of interest and to what extent. *Pinto*, 214 F.3d at 395.  The June 5, 2000 report was available before First Reliance made its final decision on June 21, 2000.  Therefore this Court looks to the June 5, 2000 office visit to determine the extent of the conflict and irregularities present.

job only requires sedentary capabilities, despite her job description indicating a more cerebral aptitude is necessary.

Small's job description, according to her occupational analysis and her employer, states a Web Technical Specialist has numerous duties. She must maintain the website in accordance with the strategy set forth by the organization, educate other personnel how the company can further market its products with the internet, train sales representatives and distributors, track data administration and content development, handle administrative portions of the website and its financing, evaluating and chartering the future of the website, and stay current with new technologies. (A.R. 166). These job tasks, according to Small's employer, require the employee to frequently relate to others and make independent decisions. They also require Small to continuously use her language, math and reasoning skills. (A.R. 160). It is clear from this description that the material duties of Small's job encompass more than just the ability to physically function at a sedentary level.

This Court must "evaluate [Small's] inability to perform [her] own or regular occupation as it is performed in a typical work setting . . . ." *Lasser v. Reliance Standard Life Ins. Co.*, 344 F.3d 381, 385 (3d Cir. 2003). Small's "regular occupation" was the usual work she was performing immediately before the onset of her disability. *Id.* at 386. Consistent with the job description from her employer, Small's job required technical capabilities and extensive responsibilities. First Reliance failed to assess how Small's ability to function at a sedentary level would enable her to perform the cognitive-based material duties of her job.

11

Accordingly, judgment will be entered in accordance with these findings of fact and conclusions of law[12]:

---

[12]Small claims another procedural irregularity occurred because Nurse Finigan provided her medical opinion during the initial and appeal stages of the claim. Although this currently violates ERISA regulations, such regulations were not in effect when First Reliance made its decision. 20 U.S.C. § 1001, et seq.; 29 C.F.R. § 2560.503-1(g) (2000); *see also Skretvedt v. E.I. DuPont De Nemours and Co.*, 268 F.3d 167 (3d Cir. 2001) (holding physician's involvement in decision-making both in initial determination and in appeal was not evidence of conflict because regulations in effect at that time did not require it).

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


KRISTEN SMALL                    :          CIVIL ACTION
                                 :
        v.                       :          NO. 02-3744
                                 :
                                 :
FIRST RELIANCE STANDARD LIFE     :
INSURANCE COMPANY, E.M.          :
INDUSTRIES, INC., and E.M.       :
SCIENCE                          :


**<u>ORDER</u>**

        AND NOW, this 28th day of February, 2005, pursuant to Rule 58 of the Federal Rules of

Civil Procedure, and in accordance with this Court's Findings of Fact and Conclusions of Law, IT

IS ORDERED that Judgment be entered in favor of Plaintiff, Kristen Small, and against Defendants,

First Reliance Standard Life Insurance Company, E.M. Industries, Inc., and E.M. Science.

                                BY THE COURT:



                                _____

                                Juan R. Sánchez, J.


13