IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____
TEN SMALL                          :
                                   :
   vs.                             :    CIVIL ACTION
                                   :
FIRST RELIANCE STANDARD LIFE       :    NO. 02-CV-3744
INSURANCE COMPANY, et al.          :
_____:

## PLAINTIFF'S SUPPLEMENTAL SUBMISSION IN SUPPORT OF MOTION FOR ATTORNEY FEES, COSTS, AND PRE-JUDGMENT INTEREST

Presently pending before this Court is Plaintiff's Motion for allowance of attorney fees, costs, and pre-judgment interest. In conjunction with plaintiff's filing, defendant has filed an opposition to the motion based upon: (a) plaintiff's alleged failure to prove "prevailing rates"; (b) its denial of benefits was not made in bad faith; (c) some of the fees and costs are not reasonable. Plaintiff responds to these points *in seriatim*.

First, plaintiff's counsel's rate of $275.00 per hour is a reasonable rate and in line with prevailing rates charged by attorneys with comparable experience in this field. Attached as Exhibit "A" is a Declaration from Michael Salmanson, Esquire, a lawyer who practices in the field of ERISA litigation. According to the Declaration, Mr. Salmanson charges $295.00 per hour, which is $20.00 per hour *more than* plaintiff's rate of $275.00 per hour. Both plaintiff's counsel's present rate of $275.00 per hour and Mr. Salmanson's rate of $295.00 are well in line with the fees ranges attested to in the affidavit of Edward J. Foley, Jr., whose survey concluded that the prevailing rates for ERISA lawyers in 2001 ranged from $200.00 to $350.00 per hour. Moreover, the present rate is in line with the $285.00 to $380.00 hourly rate approved by Judge Rufe in the fee petition filed in the case of Hooven vs. Exxon Mobile Corporation, Civil Action 00-5071 (05D0231P.pdf) (Rufe, J., E.D. Pa., February 14, 2005).

Plaintiff counsel has extensive experience in handling ERISA benefit cases in both pre-litigation and litigation postures. The following non-exhaustive list are the ERISA disability and private disability cases plaintiff's counsel has handled within the past five years alone: Pelligrini vs. Bayer Corporation, 04-1554 (E.D. Pa.); Armstrong vs. Raytheon Engineers, 03-4420 (E.D. Pa.); Burwell vs. Albert Einstein Medical Center,

00-5783 (E.D. Pa.); Geary vs. UNUM Life Insurance Company of America, 04-2308 (E.D. Pa.); Gray vs. Trustmark Ins. Co., (C.C.P. Philadelphia County April Term, 2003 001360); Mandel vs. Provident Life & Accident Insurance Co., 02-9124 (E.D. Pa.); Mione vs. University of Pennsylvania Health Plan, 03-3748 (E.D. Pa.); Rodweller vs. Mills Corporation, 03-4832 (E.D. Pa.); Thompson vs. UNUM Provident Corporation, 02-4593 (E.D. Pa.); Palumbo vs. Life Insurance Company of America, 04-1102 (E.D. Pa.); Ferrante vs. Liberty Life Assurance Company, 03-3632 (E.D. Pa.); Williams vs. Verizon Services Corp., 04-071 (E.D. Pa.); Yacyk vs. Unisys Corporation, 03-2319 (E.D. Pa.).

Secondly, defendant's argument that it did not act in "bad faith" in this matter is not dispositive on the issue of whether attorney fees should be awarded. As stated in plaintiff's original memorandum of law, there is no requirement that "bad faith" be shown before attorneys fees or costs can be awarded. Rather, mere "culpability" suffices to satisfy this element. McPherson vs. Employee's Pension Plan of American Re-Insurance Co., Inc., 33 F.3d 253 (3d. 1994). Here, defendant, and no one else, is to blame for the fact that an arbitrary and capricious decision was made on plaintiff's claim. Defendant argues that plaintiff is to blame because she neglected to furnish a copy of the June 5, 2000 progress report of Dr. Grogan. This point ignores the numerous obvious defects in defendant's own handling of the claim which were brought out by the evidence before the Court, including:

- The fact that, out of 104 days spanning the time between when the appeal was received on March 8, 2000 and the time the denial letter was forwarded on June 21, 2000, Ms. Winston worked on this claim a mere four days, including: (a) writing to and receiving back from the medical department on May 18th (RSL 65); (b) writing to Dr. Grogan on May 19th (RSL 60); (c) writing to the claimant on May 22nd and advising: "we will be contacting you in the future with an update or to inform you if additional information will be required" (Before issuing its denial, defendant neither contacted claimant with an up-date nor advised that additional information would be required, contrary to its representations to do so). (RSL 64); writing to and hearing back from the medical department on June 21st and then sending the denial letter on the very same day, June 21st. (RSL 32-34, 36). For the remaining 100 days, the claim simply sat idle. Indeed, *29 days* passed between the time when Winston received the medical

information from Dr. Grogan on May 23rd, and she acted on the information by sending it to the medical department. (RSL 56). Ms,. Winston performed absolutely no follow-up on the file during that time. Remarkably, even though the March 6, 2000 progress note from Dr. Grogan plainly indicates that claimant was scheduled for a follow-up in three months time (i.e., June of 2000), Ms. Winston did not think to call claimant for an up-date on her condition until *after* the denial was issued on June 21st, learning on July 10th that "claimant did not return to work, meds only worked approximately one month". (RSL 30). More incredibly, Ms. Winston's own June 21st denial letter quotes from Dr. Grogan's March 6, 2000 progress note: "…and he asked you to see him in three months time". (RSL 33). Knowing that, Ms. Winston still failed to consider up-dating her file with information about claimant's current condition during the 29 days after she received Grogan's information but before the review was conducted and the denial was issued. Moreover, Winston never up-dated claimant by advising her of the information Winston received from Grogan as she indicated she would do in the May 22nd letter, thus denying and depriving claimant of any opportunity to submit the June 5, 2000 progress note herself.

- Dr. Grogan never stated that claimant achieved maximum medical improvement, and Ms. Winston was aware of this fact and was further aware of the fact that claimant was scheduled to be seen in follow-up in June of 2000.
- The very fact that the February 2, 2000 progress note states that claimant slept soundly from 10 p.m. to 8 a.m. (RSL 45), and yet Dr. Grogan continued to opine that claimant could not work (RSL 44), bolsters the point that whether or not claimant could sleep soundly throughout the night was not indicative of her ability to work. Indeed, even though she was sleeping soundly through the night in February 2000, Dr. Grogan continued to opine that she was disabled from work at that time. (RSL 44). Yet, Ms. Winston based her denial on the fact that claimant had normalizing sleep cycles. Reasoning that benefits were not warranted, Ms. Winston remarked in the June 21st denial letter: "As of [March 6, 2000] you were responding well to treatment *with normalizing sleep cycles*". If the fact that normalized sleep cycles was enough for Winston to conclude that claimant was no longer disabled,

3

then she would have been no longer disabled as of February 23, 2000, the date that Finigan opined should have been the disability cut-off date. (RSL 36).

- Ms. Winston testified that she understood and assumed that the May 2000 Attending Physician Statement was predicated upon Dr. Grogan's examination of March 6, 2000, and was not reflective of her condition in May. Indeed, Ms. Winston had no idea what claimant's condition was in April, May, or June of 2000, and did not request information about claimant's condition during that period of time from claimant or claimant's physician.

Moreover, plaintiff has demonstrated a benefit to plan participants as a whole. Quoting from plaintiff's prior memorandum of law: "…[r]equiring defendant to shoulder the expense of its denial may deter defendant from making an arbitrary and capricious decision in the future. *See, e.g.,* Baker vs. Raytheon Engineers, no. 96-721 (Fullam, J. May 1997)(97d0673p.pdf) ("And there may be some slight deterrent effect, and some ensuing benefit to other plan participants if, as a result of a counsel fee award, defendants take a more realistic approach in future cases"). The same logic applies here." In short, other plan participants stand to benefit if defendant is deterred from making arbitrary and capricious decisions in the future by an award of fees and costs presently.

Lastly, all the requested fees and costs are reasonable. First, there was a proper basis to oppose the motion to strike the jury demand. Indeed, plaintiff had to oppose the motion to preserve her rights to a jury trial in the event of an intervening change in the law or in the event that the law of another circuit may have applied and permitted a jury trial. These grounds justify the filing of an opposition. Secondly, the time and expense of taking Ms. Winston's deposition is reasonable and necessary. Ms. Winston was the decision-maker on this claim, and her deposition gave invaluable insight into both the claims process and the actual basis for the decision in this case. Ms. Winston was the sole witness called by plaintiff at trial. Her deposition streamlined the issues for trial, and was further used for impeachment purposes at trial. Ample reference was made to the admissions and statements made by Winston during her testimony. In plaintiff's Brief *Sur* The Court's 12/17/04 Order, the following appear:

- "The decision-maker on the claim, Dorothy Winston, testified that she relied exclusively on nurse

Finigan to explain and assess the physical and non-physical consequences of plaintiff's medical condition and assess plaintiff's capacity to perform her regular occupation -- the standard for determining disability under the policy language itself. By her own admission, Ms. Winston did not have a working knowledge of hypersomnia disorder or periodic leg movement disorder. She never evaluated such medical conditions before or since the claim at issue on any other claim. Ms. Winston freely admitted that she understood at the time that plaintiff's medical conditions involved more than simply difficulty in sleeping and staying awake. She further acknowledged that she knew plaintiff's job required significant aptitudes and non-physical skills. However, Ms. Winston stated that she did not bring any independent analysis to these issues most notably because she could not. Rather she relied on the nursing assessment to address these issues." (Brief at 2-3).

- "It is significant to recall that, when questioned at the hearing, Ms. Winston acknowledged her deposition testimony where she stated that she did not even know that a medical review had been conducted before the initial determination. Ms. Winston's admitted lack of familiarity with the substance of and rationale behind nurse Finigan's reviews while the matter was on initial review (RSL 173. 232) answers the question why she did not have any concern in allowing her to review the matter on appeal." (Id. at 4).

- "From that information, nurse Finigan opined that Dr. Grogan released plaintiff to full time sedentary work. However, the form does not do so. Indeed, the form states that plaintiff had not achieved maximum medical improvement, and did not provide a return-to-work date. Dorothy Winston agreed with these observations which contradict nurse Finigan's opinion." (Id. at 4-5).

- "For example, nurse Finigan did not explain the significance to Dr. Grogan's instruction that she be followed in three months time, did not explain the medications and efficacy of them, did not explain the nuances of the affliction, did not assess the restrictions, limitations, and capabilities as they related to the actual material job duties of plaintiff's regular occupation, did not explain the non-physical symptoms associated with plaintiff's condition -- all areas on which Winston testified that she had relied on Finigan to assess." (Id. at 6-7).

- "Ms. Winston admitted consistently and often that plaintiff did not know what specific records she had

5

obtained from Grogan, nor did plaintiff have any opportunity to respond to, comment upon, or supplement the information Winston obtained. These facts are true because Winston did not inform plaintiff what specific records and information from Grogan were requested and received." (Id. at 8).

- "First, there is no explicit grant of authority in the policies and procedures manual that authorized Winston to do so, and she testified that she was never advised verbally be any supervisor that she could do so. When asked upon what authority she obtained the records, Winston testified that, when the medical department requests additional records, they are permitted to obtain them. Again, when asked to point to a specific grant of authority in the policies and procedures handbook, she could not do so. Second, even assuming that it is true that Winston could properly have obtained the records that the medical department requested, she requested and obtained more than just the records requested by the medical department and did not obtain all the records requested by the medical department." (Id. at 8-9).

- "In the medical review of 5/18/00, nurse Finigan advised Winston to: "Please obtain the results of the sleep study and office notes from 8/99 to present for review." (RSL 65). Winston in fact obtained a Physical Capacities Statement (RSL 57-58) which was <u>not</u> a record asked for by Finigan. Moreover, Winston did not obtain Grogan's June 5, 2000 office note, a record clearly available to Winston before she forwarded the medical information to Finigan on June 21, 2000 and made her denial on the same day (RSL 36). Significantly, Winston testified that she relied on the PCS when deciding the claim." (Id. at 9).

- "When asked whether she was aware that plaintiff's job entailed non-physical skills and aptitudes, Ms. Winston confirmed that she did indeed possess this information. When asked how she assessed plaintiff's ability to perform the material duties of her regular occupation, Ms. Winston answered that she relied on the medical department and Dr. Grogan." (Id. at 12).

The Court did credit several of plaintiff's above arguments when determining that defendant operated with a conflict-of-interest. Moreover, since the deposition was necessary, the costs for the transcript should be reimbursed as well. Notably, defendant has not objected to the cost of the transcript as unreasonable, only that

the deposition was unnecessary and thus not reimbursable.

Lastly, the expert fee of $500.00 was necessary to secure Dr. Grogan's testimony in the event that his testimony was needed to authenticate the June 6, 2000 progress report for admission into evidence. As it turned out, defense counsel did not raise a hearsay objection at trial, and consequently, there was no need to call Dr. Grogan to testify to the substance of the record. Nonetheless, since defense counsel had consistently objected to the admissibility of the record prior to trial, plaintiff's counsel was forced to cover all bases and to arrange to have Dr. Grogan available to testify in the event that a technical objection was sustained to the record's admissibility. Moreover, it is not unreasonable for plaintiff's counsel to obtain medical records independent of the administrative record. Indeed, it was only through that process that plaintiff's counsel could verify or challenge the completeness of the administrative record.

For these, and the reasons set forth in plaintiff's original motion, plaintiff respectfully requests that this Court allow attorney fees and costs. Plaintiff also attaches as Exhibit "B" an up-dated itemization of time and expenses.

**LAW OFFICES OF VINCENT F. PRESTO**

By: _____
   VINCENT F. PRESTO, ESQUIRE
    124 Chestnut Street, Suite 3
    Philadelphia, PA  9106
    (215) 922-7000
    Attorneys for Plaintiff

# EXHIBIT "A"


# EXHIBIT "A"

# EXHIBIT "B"

CERTIFICATE OF SERVICE

I, Vincent F. Presto, Esquire, hereby certify that I served a true and correct copy of this Plaintiff's Supplemental Memorandum of Law in Support of an Award of Attorney Fees, Costs, and Pre-Judgment Interest upon the person(s) set forth below on the date indicated via United States regular mail.

Heather Holloway, Esquire
RAWLE & HENDERSON, L.L.P.
The Widener Building
One South Penn Square
Philadelphia, PA 19107

_____
VINCENT F. PRESTO, ESQUIRE

Date: _____